SO ORDERED: May 23, 2016.

_____
**Robyn L. Moberly
United States Bankruptcy Judge**

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | |
|---|---|
| IN RE: ) | |
| ) | |
| TAMMY THORNTON ) | CASE NO. 15-6762-RLM-13 |
| CHRIS S. THORNTON ) | |
| ) | |
| Debtors ) | |
| _____ ) | |

**ORDER SUSTAINING CREDITOR'S OBJECTION TO CONFIRMATION OF PLAN
AND DIRECTING DEBTORS TO AMEND PLAN, CONVERT CASE
OR DISMISS CASE WITHIN 30 DAYS**

This matter came before the Court on May 11, 2016 for hearing upon the objection of 21st Mortgage Corporation ("21st Mortgage") to confirmation of the debtors' chapter 13 plan.  For the reasons stated below, the Court finds that the value of 21st Century's secured claim is $39,937 and that 21st Mortgage's objection is SUSTAINED

***Background***

21st Mortgage holds a security interest in the debtors' 2005 Champion Fortune Value 32 x 75 doublewide manufactured home (the "Home") which is located in a rural,

1

agricultural area in Monrovia, Indiana. The debtors do not own the land upon which the Home currently sits. 21st Mortgage filed a proof of secured claim for $52,673.19. The validity of the 21st Mortgage's security interest in the Home is not disputed and 21st Mortgage does not claim an interest or a lien in the real estate upon which the Home sits. Only Mrs. Thornton is liable on the loan.

In order to invoke the cram down option, the debtor, frequently through the filing of a plan of reorganization, proposes a value of the secured portion of a creditor's lien to be paid over the life of the plan while the debtor retains the collateral. The unsecured portion of the creditor's debt is then paid at the same percentage as general unsecured creditors, and discharged if the plan payments are completed. The debtors' chapter 13 plan attempts to cram down 21st Mortgage's secured claim and proposes that the value of its secured claim, and hence, the value of the Home, is $20,000 payable at 5.25% interest. 21st Mortgage objected to both the value of its secured claim and the proposed rate of interest, but has since withdrawn its objection to the proposed rate of interest. The value of 21st Mortgage's secured claim remains in dispute.

## *Discussion*

### Chapter 13 Plan Confirmation Requirements

The requirements for confirmation of a chapter 13 plan are set out in §1325 and the debtors have the burden of proving that their plan complies with those requirements.[1] *In re Eaddy, 2016 WL 745277, at *4 (Bkrtcy.D.S.C., 2016)*; *In re Gensler, 2015 WL 6443513, at *3 (Bkrtcy.D.N.M., 2015)*; *In re Moffett-Roberts, 2014 WL 1674331, at *3 (Bkrtcy.D.Kan., 2014)*; contra, *In re Kollmorgen, 2012 WL 195200, at *2 (Bkrtcy.D.Kan.,2012)*; *In re Krueger*, 457 B.R. 465, 475 (Bankr. D. S. C. 2011) (in

---

[1] See also, *In re Tucker*, 2013 WL 3230615 at *3 (Bankr. M. D. Ga. 2013) (acknowledging that courts disagree over who has the burden of proof when a confirmation objection raises issues of valuation, but ultimately holding that the debtor bears the burden because the debtor must show that the chapter 13 confirmation requirements are met). Which party bears the burden of proof appears to depend on how the valuation issue comes before the Court. Here, the issue of valuation was raised by objection to a provision in the plan. Had 21st Mortgage filed a motion for valuation under Fed. R. Bankr. P. 3012, it would have borne the burden of proof. *In re Prewitt*, 2015 WL 8306422 at *5 (Bankr. E. D. Tex. 2015). Had the debtors objected to 21st Mortgage's claim, the debtors would have borne the initial burden of rebutting the claim's presumptive validity under Fed. R. Bankr. P. 3001(f) and 21st Mortgage thereafter would have borne the ultimate burden of proving the amount and validity of its claim. *Eaddy*, at *8, n. 16;

2

considering whether a debt is a domestic support obligation, the court held that "it is generally accepted that a party objecting to confirmation bears the burden of proof"). Among those requirements is §1325(a) (5) (B) (ii) which requires a debtor to pay to the secured creditor under the plan the present value of its secured claim.

## Valuing a Secured Claim under §506

The value of a secured creditor's claim is determined under §506. The parties do not dispute that the Home is personal property which was acquired by the debtors for personal, family or household purposes. Under §506(a) (1) the value of a secured claim is to be determined in light of the purpose of the valuation and the proposed distribution or use of the property. Under §506(a) (2), the value of personal property is determined based on replacement value of the property. *Associates Commercial Corp. v. Rash*, 520 U.S. 953, 963 (1997). Section 506(a) (2) defines "replacement value" as "the price a retail merchant would charge for property of that kind considering the age and condition of the property at the time value is determined." The three generally accepted appraisal techniques to determine the value of property are the cost approach, the sales comparison approach and the income approach. The replacement value of a manufactured home oftentimes is arrived at by using either the cost or sales comparison approach, or a combination of the two. *In re Meredith, 2013 WL 4602966, at *3 (Bkrtcy.M.D.Pa.,2013).*

## Creditor's Expert and Opinion as to Value

Both the debtors and 21st Mortgage offered the expert testimony of their respective appraisers and their appraisals. Both appraisers are certified manufactured home appraisers and both personally inspected the interior and the exterior of the Home.

The creditor's expert, Harold Collins, applied the cost approach and used the NADA Manufactured Housing Appraisal Guide to determine replacement value. The NADA guide utilizes the National Appraisal System (NAS). The NADA/ NAS methodology is very formulaic. Under this system, the home's make, model, age and estimated remaining physical life are considered in arriving at the value of the home's

3

base structure – the "box".  The base value is multiplied by a "location adjustment" percentage, which, for manufactured homes located in Indiana, is 1.02%.  That figure is multiplied by a "condition adjustment" percentage. The condition of the home is determined by completing a standard form worksheet and assigning a point value to the standard items listed on the worksheet which are typically found within or on the exterior of a manufactured home.   The value is further adjusted by taking into account the cost of repairs and any add-on components (upgraded items not typically included in a manufactured home).  Those adjustments and corresponding dollar amounts are set out in detailed, itemized worksheets.  The NADA guide is based on market information derived from all NADA regions and contemplates use of both the cost and sales comparison approaches, where appropriate.  The "general instructions" portion of the guide, which was included in Collins' appraisal, provides that

> The N.A.D.A. Manufactured Housing Appraisal Guide is the modified summation approach to value.  Values reflected in the publication are based on market data received from a variety of sources  in the nine N.A.D.A. regions, and these values represent a sited (delivered and set up) structure in the current year depreciated replacement retail dollars.  In the absence of local, reliable, similar comparable sales data, the values are considered to be FAIR MARKET RETAIL VALUES.

The Home has 2432 square feet, with 3 bedrooms and 2 baths.  Based on the NADA guidelines, Collins gave the Home – the "box"- a base value of $41,580.  Collins made the 1.02% upward location adjustment which increased the value to $42,400.  Collins found the point value for the condition of the Home to be 96, falling into the "fair condition" range, and applied an 83% condition adjustment which resulted in a value of $35,200.  He estimate that the cost of missing "running gear" (wheels, axles) was $1765.  He estimated that the cost of repairs was $5066 which included repairs to the siding, windows and to the flooring and carpets which was caused in part by the debtors' large dogs.  After backing out these two numbers, he arrived at a value of $28,369.  Collins made a $12,296 upward adjustment for "components" which included roofing, siding, sliding glass doors, porcelain bathroom fixtures, appliances, furnace, fireplace, smoke detector, hardwood cabinets, double stainless steel sinks and upgraded roof and wall insulation.  He added an additional $352 as an "accessories" upgrade for the condition of the guttering and down spouts.  He arrived at a value of

4

$41,017 after adjustments. The dollar amounts for costs of repairs, components and accessories were itemized in the worksheets. Collins' appraisal further showed an upward adjustment of $11,375 for "delivery and setup", arriving at a final replacement value of $52,392. The court understands this upward adjustment to be what a buyer would have to pay if the Home were still on the manufacturer's lot and had to be delivered and set up. However, the "general instructions" to the NADA guide state that the values reflected in the guide represent a "sited" (delivered and set up) structure. 21st Mortgage did not argue for this delivery and set up fee in the hearing and maintained that the Home's replacement value was $41,017. Collins did not review sales of comparable manufactured homes in the area and did not use the sales comparison approach.

Debtors' Expert and Opinion as to Value

The debtors' appraiser, T.A. Freije, used both the cost approach and the comparable sales approach. He opined that the Home's value was $20,000 under both approaches. Like Collins, he used the NADA guidelines for the cost approach. His base value for the Home was $61,314. He made a 1.02% upward adjustment to the base value, like Collins, but referred to this adjustment as a "cost modifier" and not a "location adjustment". The value after making that adjustment was $62,540.28. He found the Home to be in "fair" condition and applied an 84% downward adjustment -- in line with Collins' 83% -- but the appraisal said the condition was "considered fair because of removal required for resale or to move to property owned by the subjects (sic) owner". The 84% condition adjustment brought the value to $52,533.84. He made a further downward adjustment of $18,386.85 which was described as an "external depreciation or state location modifier". To the right of this number appeared the notation "this number generated from Nada (sic) Removed for resale Data". The value after this adjustment amounted to $34,146.99. He made no further adjustments for cost of repairs or components and it is not clear from either his written appraisal or his testimony whether his base value of $61,314 took these factors into account. Freije's final opinion of market value was $34,000. Although not contained in his written appraisal, Freije testified that the cost of moving the Home to a buyer's location would

be between $13,000 and $18,000, according to local contractors with whom he spoke. He established a moving cost of $14,000, subtracted it from his $34,000 market value, and arrived at a value of $20,000 under the cost approach.

Freije also used two sales of comparable homes ("comps") to determine value. The Home is an 11-year old doublewide (2432 square feet), all-electric utility home located in Morgan County, Indiana. Freije did not personally inspect the interior of either of the homes included in the comps. The first of Freije's two comps was a 32-year old singlewide (1344 square feet), gas utility home located in Vigo County, about 50 miles away. The second comp was an 8-year old singlewide (1680 square feet) gas utility home located in Vermillion County, about 70 miles away. The first home was sold for $10,000 in February 2013, more than 3 years before the date of the valuation hearing. The second home was sold for $12,006 in August, 2014, more than a year and a half before the date of the valuation hearing. Neither sale was an arms-length sale because both homes had been repossessed. As for the first comp, Freije made an upwardly adjustment of only $5,000 for the disparity in age (the "comp" is 21 years older than debtors' home) and another $5,000 adjustment for the size. The second comp was newer than the subject Home and therefore no upward adjustment for age was needed. Freije made only a $3500 upward adjustment for that home's size (debtors' home is 50% larger than the "comp"). Freije's opinion as to value under the comparable sales approach was $20,000.

The Court finds that the comparable sales used by Freije are not sufficiently comparable to give a credible opinion as to value. Although Freije stressed how location of a manufactured home can affect its value, neither home used in his comps is located in the same county as the subject Home. Unlike the subject Home, both were singlewides and had gas utilities. Both homes had sold more than a year before the date of the valuation hearing. Neither sales price was indicative of fair market value because they were repossessions. Freije's adjustments to account for size and age of the first comp were inadequate. The NADA guide encourages the use of comparable sales when the sales are local, reliable and comparable, but the comps used here fulfill none of these requirements. The Court will disregard Freije's opinion as to value under the comparable sales approach.

Comparison of Experts' Opinions as to Value under the Cost Approach

Courts have favored the use of the NADA guide and the NAS to determine the replacement value of manufactured homes.  See, *Eaddy* at *7 (finding that NADA guide valuation method used by creditor's expert was more persuasive than debtor's expert who relied on comps that were not comparable with the debtor's property and noting that "NADA valuations…are utilized with increasing frequency in bankruptcy courts and are generally accepted".); *Prewitt* at *7 (with respect to creditor's expert who used the NADA/ NAS guide and debtor's expert who used only comparable sales approach, court noted that "assuming that it is used in its entirety by a knowledgeable and diligent appraiser, the NAS process to evaluate the retail price of a manufactured home unit is consistent with, and conducive to, the determination of the retail merchant value required under §506(a)(2)"); *Gensler* at *4 ("using NADAguidelines.com to value manufactured houses is an accepted practice in bankruptcy court");  *Moffett-Roberts* at *3 (NADA guide an appropriate starting point); *In re Cranford, 2012 WL 5939967, at *2 (Bkrtcy.M.D.N.C.,2012)* (creditor's expert witness' methodology under NADA guide "appropriate" to determine value of manufactured home); *Kollmorgen* at *4 (use of the NADA guide is appropriate "starting point").  Collins' appraisal substantially complied with the NADA/ NAS methodology, and therefore the Court finds that Collins' opinion as to value to be more credible.  Freije's base value was almost $20,000 higher than Collins' and he arrived at this figure my multiplying the total square footage (2432) by $25.2113 per square foot.  It is not evident from his appraisal how Freije arrived at this price per square foot.  Freije's 1.02% "cost multiplier" adjustment appears to correlate with Collins' 1.02% "location adjustment".  Freije's condition adjustment (84%) was comparable to Collins' (83%), but Freije downgraded the condition of the Home to "fair" due to the fact that a buyer would have to pay to remove the Home from its current location since the sale would not include the land.  How removal costs affected the Home's condition was not explained.  Freije further downwardly adjusted the value by $18,386.85 for costs of removal because that amount was generated from NADA "removed for resale" data.  Freije again discounted the value for costs of removal when

7

he backed out the $14,000 cost from his rounded market value of $34,000.  Freije did not follow the NADA/ NAS methodology.  He included no itemized worksheets that detailed his adjustments.  The analysis he used is not credible because it included three separate deductions for removal costs and contained nothing about cost of repairs and value of upgraded components which are essential in determining value.

      The court is cognizant that the debtors do not own the real estate upon which the Home sits and that a buyer would incur removal costs.  But, removal of personal property from its seller's existing location to the buyer's intended location is inherent in personal property sales transactions.  The costs incurred by the buyer in getting the property to its intended location is a cost of sale.  Section 506(a) (2) expressly provides that costs of sale are not to be deducted in determining the replacement value of personal property.  Collins' final opinion as to value appropriately left out delivery and set up costs.  Courts consistently have held that, under §506(a) (2), value cannot be reduced by costs of removal and cannot be increased by costs of set up and delivery. *Eaddy* at *7-8 (in adjusting NADA value downward to exclude pick up and set up costs, court stated that "courts have uniformly rejected including these costs when determining value pursuant to section 506(a)"). *Prewitt* at *8; *Gensler* at *3 (where debtor did not own the land upon which her manufactured house sat, the court agreed that costs of removal and relocation are not be deducted from its value and, for the same reason, delivery and set up costs cannot be added to its value); *In re Fortenberry, 2014 WL 7407515, at *4 (Bkrtcy.S.D.Miss.,2014)* (costs of removing and relocating manufactured home to creditor's (21st Mortgage) lot should not be included in value for §506 purposes); *Kollmorgen* at *4, n 25.

      Section 506(a) (1) also prohibits deducting costs of removal from value when a debtor proposes to retain the property.  Section §506(a) (1) and *Rash* say that the value of a secured claim shall be determined "in light of the purpose of the valuation and of the proposed disposition or use of such property".  Where a secured creditor objects to confirmation of a chapter 13 plan, the debtor may surrender the collateral or keep the collateral over the creditor's objection.  The proposed "disposition or use" of the collateral turns on which of these alternatives the debtor chooses.  *Rash* recognized

8

that the replacement-value standard "distinguishes retention from surrender and renders meaningful the key statutory words "disposition or use". *Rash*, 520 U.S. at 962. The purpose of the valuation here is to determine whether the debtors' chapter 13 plan meets §1325 requirements and the debtors in that plan propose to retain the property as their residence.  There is no evidence in the record suggesting that the debtors intend to remove or will be forced to remove the Home from the land it now sits on.  The owner of the land upon which the Home sits was not identified.  The fact that a buyer of the Home would incur costs in moving the Home is irrelevant because the debtors' proposed use of the Home is retention on its current site, and not sale.  See, *Gensler* at *4 ("the court therefor concludes that when the proposed disposition is to keep a mobile home at its current location, *Rash's* rationale indicates that all moving costs, whether increasing or reducing value, should be disregarded".)

<u>Scope of 21st Mortgage's Security Interest</u>

A copy of the security agreement between Mrs. Thornton and 21st Mortgage was attached to its proof of claim.  It provides that 21st Mortgage has a security interest in "(1) the Manufactured Home and in all goods that are or may hereafter by operation of law become accessions to it and (2) all proceeds of such Manufactured Home and accessions."  Indiana's version of Article 9 of the UCC defines "accession" as "goods that are physically united with other goods in such a manner that the identity of the original goods is not lost".  Ind. Code §26-1-9.1-102(1).  An "accession" under Article 9 is generally thought of as a good that has become integrated with a principal property such that it cannot be detached without causing injury and has little independent utility if removed.  See, *Eaddy* at *6.  Examples of accessions include porches, storm windows, metal skirting around a manufactured home, heating appliances (furnace, HVAC unit), carpeting, fireplaces, bathroom fixtures and built in dishwashers.  *Id*.  Here, Collins made an upward adjustment for value of the fireplace, smoke detector, furnace, water heater, "150-200 electric main", built in dishwasher, shower and tub, all of which are properly classified as accessions.  However, he also made an upward adjustment for the refrigerator, ice maker, oven, and gas washer and dryer.  These goods would have independent utility if they were removed from the Home and are not so integrated with

9

the Home that they cannot be removed without injury.  They are not accessions and there is no evidence that 21st Mortgage holds a security interest in them.  Collins valued these appliances at $1080, and that amount will be subtracted from $41,017.

## Conclusion

The court finds Collins' appraisal to be more credible and the value of 21st Mortgage's secured claim is $39,937 after deducting the value of property not covered by 21st Mortgage's security interest.  The debtors are ordered to (1) file an amended chapter 13 plan consistent with this order; (2) convert this case to a case under chapter 7 or (3) dismiss this chapter 13 case within thirty (30) days of the date of this order.

**#     #     #**